***********
In accordance with the directives of the North Carolina Court of Appeals, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission, and that the Industrial Commission has jurisdiction of the parties and of the subject matter;
2. That all parties are subject to and bound by the North Carolina Workers' Compensation Act; *Page 2 
3. That all parties have been properly designated and' there is no question as to misjoinder or nonjoinder of parties;
4. That the Plaintiff sustained a compensable injury on October 16, 2004 when a large patient fell on her, spraining and fracturing her left ankle;
5. That an employment relationship existed between the employee and employer on October 16, 2004;
6. That the employee's average weekly wage is $391.60, yielding a compensation rate of $261.08;
7. That the Defendants filed a Form 33 Request for Hearing on January 11, 2006 citing that the parties disagreed as to the amount of disability to Plaintiff's left ankle and existence and compensability of other injuries; and
8. That mediation was held and reached impasse on July 24, 2006.
 ***********
The following documents were introduced into evidence as:
 EXHIBITS
1. All NCIC Forms from the from the October 16, 2004 injury including the following:
 a. Form 18 dated September 30, 2005
 b. Form 22
 c. Form 33 dated January 11, 2006
 d. Form 60 dated October 7, 2005
2. Index/Summary of Medical Records and the medical records included herein pertaining to the October 16, 2004 injury. *Page 3 
3. Plaintiff's responses to Defendants' discovery.
4. Plaintiff's personnel file or portions thereof.
 ***********
In accordance with the directives of the North Carolina Court of Appeals, and based upon all of the competent, credible and convincing evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was fifty-four years old. Plaintiff began her employment with Defendant-Employer on December 16, 2002, as a Certified Nursing Assistant ("CNA"). She continued her employment until December 21, 2005. On October 16, 2004, Plaintiff suffered a compensable injury when a large patient fell on her, causing her to sprain and fracture her left ankle. Plaintiff also struck her left knee on the cement ground when she fell. On January 3, 2005, Defendant-Carrier filed a Form 61 indicating that the October 16, 2004 injury had been denied as to the left knee and left leg. Defendants accepted Plaintiff's claim for her ankle on a Form 60 dated October 7, 2005.
2. Plaintiff was initially diagnosed with a left ankle sprain by Dr. Jeffrey Daily on October 19, 2004. Dr. Daily restricted Plaintiff to sedentary work and instructed her to wear a removable boot. On November 18, 2004, Plaintiff presented to Dr. Alice Coyle for a secondary evaluation of her foot, ankle and knee. A bone scan performed at this evaluation indicated a left ankle sprain in addition to a fracture of her distal fibula in her left ankle. Plaintiff returned to Dr. Daily on December 10, 2004 with the x-rays that revealed an avulsion injury to the lateral malleolus. Dr. Daily repeated x-rays and found the same fracture, but did not change Plaintiff's treatment and continued plaintiff's work restrictions. *Page 4 
3. Plaintiff followed up Dr. Zucker on December 20, 2004. At this visit, Dr. Zucker indicated that Plaintiff's pain was reported as an eight out of ten and that she was unable to rest because of the pain. Dr. Zucker opined that Plaintiff should be put in a cast, but Plaintiff did not want to wear a cast. Instead, Dr. Zucker put her in a CAM boot and advised her to wear that when she walked.
4. When Plaintiff returned to Dr. Daily on February 15, 2005, Dr. Daily reported that Plaintiff was out of her orthosis and walking without much problem. He noted that she continued to have some lateral ankle swelling and some anterior ankle pain with activity. Plaintiff was still experiencing this swelling when she returned to Dr. Daily, six months after her original injury, on April 18, 2005. Dr. Daily attributed this to the residual symptoms of her fracture.
5. On July 19, 2005, Dr. Daily released Plaintiff with a three percent rating to her ankle because of the chronic swelling changes and other issues in the ankle. He encouraged Plaintiff to call him if she had any significant changes or problems.
6. Plaintiff returned to Dr. Daily on March 14, 2006 complaining of tightness in her heel cord. Dr. Daily attributed Plaintiff's problems to her excess weight, problems associated with motion, plantar fascia related problems and general inactivity. Dr. Daily opined that Plaintiff's difficulties did not require treatment and should improve over time. Plaintiff returned to Dr. Daily again on May 2, 2006 for an evaluation as to any worsening of her condition. Dr. Daily found no significant change in Plaintiff's condition and released her from his care.
7. On December 8, 2006, Dr. Daily again examined Plaintiff in preparation for his deposition testimony. He opined that Plaintiff's ankle was stable, there was no degeneration of the joint and Plaintiff had not undergone any significant change in condition since the release *Page 5 
and rating. Dr. Daily opined that Plaintiff was not in need of further treatment for the ankle, either now or in the foreseeable future, that there were no surgical options and that he would not have rated Plaintiff had he believed there was any need for further treatment. While he recognized that Plaintiff's current conditions were, in part, indirect results of her work-related injury, they do not require treatment beyond general following of her condition and there is no treatment that he can offer her. He further stated that should Plaintiff's condition deteriorate to the point of requiring treatment, it would likely happen well within a two-year period.
8. Plaintiff continued to work with Defendant-Employer from the time of her injury until December 21, 2005, when she was terminated for sleeping on the job, being away from her assigned hall at times other than her allotted meal and ten minute breaks, and for using the residence televisions. Prior to her termination, Plaintiff had received counseling for four or five other employee violations and attendance problems. Plaintiff denied that she was sleeping on the job. The Full Commission finds as fact that Plaintiff's employment was terminated for reasons that any non-injured employee would have been terminated.
9. Plaintiff had begun working part-time with Assisted Living Home Care, Inc., prior to her termination from Defendant-Employer. She continued that part-time position until May 2006, earning $8.60 per hour for fifteen hours of work per week. Plaintiff currently works for Forrest Oak as a CNA, working four to five days, or thirty to thirty-four hours per week, earning $9.90 per hour where she earned $10.74 an hour with Defendant-Employer. Plaintiff calls a friend to work for her if her leg and foot start hurting too much and estimated that she works somewhere between fifty-eight and sixty-eight hours every two weeks.
10. Plaintiff always worked eighty hours a week for Defendant-Employer before she had her accident. She also had the option of working overtime, and she sometimes did this. Since *Page 6 
her accident, Plaintiff has been unable to work overtime because her leg and foot hurt too much to stay on her feet that long. Plaintiff looked for work that pays more than $9.90 an hour, but she could not find anything. She went to other nursing homes to see which ones had lifts, but most of them did not. She applied at Britthaven, but Britthaven did not hire her. She also applied at Stanly Manor Home Health Care and Hope Home Health, but they never called her back.
11. Plaintiff received unemployment benefits from December 2005 to March 2006, totaling $1,834.00. She did not receive her full benefit amount because she continued her part-time work with Assisted Living Home Care during this period of time.
12. At hearing, Plaintiff testified that this accident affected her left knee. She testified that when she fell, she struck her left knee on the cement, and that since the accident; it gives out and forces her to catch herself. She also testified that her ankle had been hurting a lot and had been giving her trouble. Plaintiff's testimony as to her left knee that was injured in this accident is corroborated by her physical therapy records immediately following the accident. These records reflect that Plaintiff was complaining of left knee pain and that she received treatment for her left knee at physical therapy. While these records reflect that Plaintiff had some pre-existing left knee problems, her testimony that her knee never went back to its pre-accident level is credible and shows that any pre-existing condition in her left knee was exacerbated by this fall. Plaintiff's left knee injury has never been evaluated for its relatedness to her compensable accident.
13. Plaintiff's foot has continued to hurt where it broke. She still wears a brace for it. Even with the brace, Plaintiff still has to sit down sometimes when her ankle becomes painful. She is not allowed to sit down at her current job, but she does it in secret. Plaintiff did not tell her current employer about her ankle injury, and she feels that they would not have hired her had *Page 7 
they known about it. She is concerned that they would see that she is still having trouble with her foot and say that she is not capable of doing her job.
14. At her current job, Plaintiff has to lift the patients herself, and this causes her pain in her foot. When she went to Montgomery Memorial Hospital on March 31, 2006, she had been working all day and her ankle and leg had swollen up so that Plaintiff was hurting badly. Plaintiff testified that lifting the patients and performing her normal duties at work had caused these symptoms. She testified that she had pain when she was with Defendant-Employer, but it was not as bad because she did not have to lift the patients and did not have to put pressure on her foot.
15. Plaintiff's average weekly wage was $391.60, yielding a compensation rate of $261.08 per week. Plaintiff's wage-earning capacity has been diminished because of her injury, as she has to call for relief at work when her foot becomes too painful. As a result, she is earning $186.00 less every two weeks than she was prior to her injury. Plaintiff's diminished earnings are a result of her inability to work, not any unwillingness to work on her part.
 ***********
The foregoing findings of fact engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment on October 16, 2004. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff reached maximum medical improvement from her ankle injury from her compensable accident on July 19, 2005, pursuant to the opinion of Dr. Daily. While plaintiff suffers from some continuing discomfort, the expert medical testimony is that her current ankle condition does not require treatment and that it should improve over time. Dr. Daily rated *Page 8 
Plaintiff with a three (3%) permanent partial impairment rating, and per this rating, Plaintiff is entitled to permanent partial disability compensation at the rate of $261.08 per week for 4.32 weeks as a result of the three percent rating to the left ankle. N.C. Gen. Stat. § 97-31(14). However, Plaintiff is entitled to a second opinion on her rating pursuant to N.C. Gen. Stat. § 97-27(b) with a physician of her choosing prior to any final determination of her benefits under N.C. Gen. Stat. § 97-31(14). N.C. Gen. Stat. § 97-27(b).
3. Plaintiff was terminated for reasons any non-injured employee would have been terminated. Seagraves v. Austin Co. ofGreensboro, 123 N.C. App. 228,472 S.E.2d 397 (1996). However, Plaintiff has found other employment and is currently working thirty to thirty-four hours per week instead of forty hours per week with overtime because of her painful and swelling left foot and ankle. This evidence shows that her wage-earning capacity is limited as a result of her work-related injury. McRae v. Toastmaster, Inc,358 N.C. 488, 597 S.E.2d 695 (2004). She is earning $186.00 less every two weeks than she was prior to her injury because she cannot work as many hours because of her painful and swelling left foot. Accordingly, plaintiff is entitled to temporary partial disability compensation pursuant to N.C. Gen. Stat. § 97-30.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, including follow-up visits to Dr. Daily to monitor her current condition and obtain a determination as to any change of condition, subject to the statute of limitations prescribed in N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. § 97-2(19).
5. The Court of Appeals mandate requires "the Full Commission [to resolve] the existence and compensability of Plaintiff's possibleinjuries to her left knee and leg. . . ." (emphasis added) The competent evidence of record shows that she struck her left knee on the *Page 9 
ground when her compensable accident occurred and that it has remained swollen and painful since that time, not returning to her baseline condition prior to her injury. An expert evaluation would be probative on the issue of causation and should be ordered and, if established or found, the type of treatment which may be required to provide relief, effect a cure or lessen the period of disability.Everett v. Well Care Nursing Services,180 N.C. App. 314, 636 S.E.2d 824 (2006).
6. Determining whether plaintiff has reached maximum medical improvement has been reached can not be determined until the evaluation of her left knee is completed as maximum medical improvement requires evaluation of all medical conditions caused by the injury by accident. Carpenter v. Industrial Piping Co.,73 N.C. App. 309, 311, 326 S.E.2d 328, 330 (1985). Plaintiff is not allowed to elect a remedy until she has reached MMI from all of her compensable injuries. Aderholt v. AM Castle Co.,137 N.C. App. 718; 529 S.E.2d 474 (2000). Plaintiff will also not know what her most munificent remedy is until she has had this evaluation and her evaluation under N.C. Gen. Stat. § 97-27(b). N.C. Gen. Stat. § 97-27(b); Vernon v. Mabe,336 N.C. 425, 431, 444 S.E.2d 191, 194 (1994). Therefore, any determination as to whether Plaintiff should receive benefits under N.C. Gen. Stat. § 97-30 or § 97-31 is reserved for a later time.
 ***********
The foregoing findings of fact and conclusions of law engender the following:
 AWARD
1. Defendants shall authorize and pay for a second opinion on Plaintiff's rating to her left foot with the physician of her choosing to evaluate, test, make treatment recommendations and treat. *Page 10 
2. Plaintiff and Defendants shall confer and recommend a physician to evaluate plaintiff's left knee, and if established or found, the type of treatment which may be required to provide relief, effect a cure or lessen the period of disability. If the parties are unable to agree, each party shall submit the name of qualified physician. The parties shall complete this mandate within fourteen (14) days of the date of this Award.
3. Defendants shall pay for medical treatment for Plaintiff's left foot and ankle as may be required to provide relief, effect a cure or lessen the period of disability.
4. Defendant shall pay the costs.
This the __ day of November, 2009.
 S/__________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/__________ DIANNE C. SELLERS COMMISSIONERS
 S/__________ CHRISTOPHER SCOTT COMMISSIONER *Page 1